UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

FRANCIA BAEZ,

                Plaintiff,

     v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
17-CV-3595 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Francia Baez commenced the above-captioned action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for disability insurance benefits and supplemental security income benefits under the Social Security Act (the "SSA"). (Compl., Docket Entry No. 1.) The Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that Administrative Law Judge Kieran McCormack (the "ALJ") (1) properly concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work with certain non-exertional mental limitations, and (2) correctly found that, based on this RFC, Plaintiff was capable of performing jobs existing in significant numbers in the national economy. (Comm'r Mot. For J. on the Pleadings ("Comm'r Mot."), Docket Entry No. 13; Comm'r Mem. of Law in Supp. Of Comm'r Mot. ("Comm'r Mem."), Docket Entry No. 14; Comm'r Reply in Further Supp. of Comm'r Mot. ("Comm'r Reply"), Docket Entry No. 21.) Plaintiff cross-moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that the ALJ (1) improperly discounted the medical opinion of Plaintiff's treating physician, and (2) based his decision on a flawed RFC finding. (Pl. Cross-

Mot. For J. on the Pleadings ("Pl. Mot."), Docket Entry No. 18; Pl. Mem. of Law in Supp. of Pl. Mot. ("Pl. Mem."), Docket Entry No. 19.) For the reasons discussed below, the Court denies the Commissioner's motion, grants Plaintiff's cross-motion, and remands the case for further proceedings consistent with this Memorandum and Order.

## I. Background

Plaintiff was born in 1967 in the Dominican Republic. (Certified Admin. Record ("R) 244, 344, Docket Entry No. 8.) Plaintiff has a high school diploma. (R. 4.) From 1985 to 1997, Plaintiff worked as a packer at a factory. (R. 111.) From 1996 to January 2010, Plaintiff worked as a cashier and floor manager at a supermarket. (R. 111.)

On April 17, 2000, Plaintiff underwent surgery to remove a benign mass on Plaintiff's right parotid gland. (R. 175.) Following surgery, Plaintiff suffered from neck pain, dizziness, and headaches. (R. 26–27.) Plaintiff initially had some relief with physical therapy. (R. 26.) In addition, medication such as Tramadol and Tylenol provided minimal relief. (R. 24, 28.) Following surgery, Plaintiff was able to continue her work as a cashier and floor manager, working four days a week from 7:00 AM to 2:00 PM. (R. 25.) However, in February of 2010, Plaintiff stopped working because of her neck pain, dizziness, and headaches. (R. 23.)

On July 2, 2010, Plaintiff applied for disability insurance benefits and social security income, claiming she had been disabled since January 6, 2010 due to a herniated disc in her neck, neck pain radiating to her right arm, a tumor behind her right ear, a cyst on her neck, and shoulder pain. (R. 90–93, 110, 118.) A disability examiner issued a determination on September 14, 2010, denying Plaintiff's applications. (R. 36–45.) Plaintiff filed an administrative appeal, and an administrative hearing was held before Administrative Law Judge Robert E. Ward on March 22, 2011. (R. 18–35.) After the hearing, ALJ Ward found that Plaintiff was not disabled.

(R. 4–17.)  Plaintiff appealed the ALJ's decision, but the Appeals Counsel declined review.  (R. 1–3.)  Plaintiff then filed a complaint in the United States District Court for the Eastern District of New York.  (R. 232.)  On June 18, 2012, the Court remanded the matter for further administrative proceedings consistent with a stipulation entered into by the parties.  (R. 363–66.)

Another administrative hearing was held on February 13, 2013 before ALJ Jerome Hornblass.  (R. 341–54.)  After the hearing, ALJ Hornblass found Plaintiff was not disabled.  (R. 367–80.)  After Plaintiff appealed ALJ Hornblass' decision, the Appeals Council remanded the matter for the ALJ to, among other things, "give further consideration to the [Plaintiff's] maximum residual functional capacity," "[f]urther evaluate [Plaintiff's] subjective complaints," and "[i]f warranted . . . obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on [Plaintiff's] occupational base."  (R. 395–99.)

On March 31 and July 14, 2015, Plaintiff appeared with her attorney for a hearing before ALJ Kieran McCormack.  (R. 253–340.)  By decision dated February 4, 2016, the ALJ determined that Plaintiff was not disabled.  (R. 226–45.)  On April 17, 2017, after considering Plaintiff's appeal, the Appeals Council denied review, making ALJ McCormack's decision the Commissioner's final decision.  (R. 217–25.)  Plaintiff filed a timely appeal with the Court. (Compl.)

### a. Hearing before the ALJ

#### i. Plaintiff's testimony

Plaintiff testified that she stopped working in February of 2010 because of neck pain, headaches, and dizziness.  (R. 23.)  The neck pain developed after Plaintiff's neck surgery in 2000.  (R. 270–71.)  Due to cervical degenerative discs, she has difficulty mopping, cooking, and sitting for more than thirty minutes.  (R. 271–73.)  Plaintiff describes the pain as constant, and

expresses difficulty turning her head. (R. 24, 26–27.) Plaintiff treats her pain with prescription medication and meets with a psychiatrist every one to two months. (R. 348.)

Plaintiff also testified that she experiences back pain, which is related to her neck pain. (R. 276–77.) She takes Morphine to cope with the pain. (*Id.*) Because of her back pain, Plaintiff cannot be in one position for too long. (R. 276, 284–85.) Plaintiff also testified that she frequently experiences headaches. (R. 282.) Cold temperatures aggravate her headaches and neck pain. (R. 283.)

### ii. Vocational expert's testimony

Theresa B. Hopkins testified as a vocational expert (VE) during Plaintiff's hearing on July 14, 2015. (R. 285–307.) The ALJ asked the VE to assume a hypothetical individual with Plaintiff's age, education, and work experience who could perform light work, with the following limitations: could only work low stress jobs, defined as jobs containing no more than simple, routine, and repetitive tasks, involving only simple work related decisions with few if any workplace changes, and where there is only occasional interaction with supervisors, coworkers, and/or the general public. (R. 289.) The VE testified that this hypothetical individual could not perform Plaintiff's past work, but could perform "light work jobs" in the national economy, such as photocopying machine operator, routing clerk, and marker. (R. 290–91.) The ALJ then added the qualification that the hypothetical individual would have to miss three days of work each month. (R. 293.) The VE testified that an individual who would have to miss three days of work per month would not be able to sustain employment. (R. 293–94.)

### b. Relevant medical evidence

The Court has reviewed the non-medical and medical evidence contained in the record, and provides a brief summary of the evidence relevant to this Memorandum and Order.

### i. Consultative examinations

Plaintiff met with several one-time, consultative examiners between September 7, 2010 and December 4, 2014.

On September 7, 2010, Plaintiff met with Dr. Zobidatte Moussa, M.D. (R. 204–07, 239.) Dr. Moussa reviewed Plaintiff's medical history and examined Plaintiff. (R. 239.) Dr. Moussa opined that Plaintiff had "mild" limitation in neck motion because of neck pain. (R. 207.)

On October 25, 2011, Christopher Flach, Ph.D., conducted a consultative psychiatric evaluation of Plaintiff. (R. 693–96.) Dr. Flach determined, among other things, that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain a regular schedule, learn some new tasks, perform some complex tasks independently when motivated, make appropriate decisions, and manage her own funds. (R. 695–96.) The results of Plaintiff's evaluation were consistent with some psychiatric problems which Dr. Flach determined mildly interfered with Plaintiff's ability to function on a daily basis. (R. 695.) Dr. Flach diagnosed Plaintiff with depressive disorder, anxiety disorder, history of neck tumor, and some dizziness. (R. 695.)

Louis Tranese, D.O., also conducted a consultative orthopedic examination of Plaintiff on October 25, 2011. Plaintiff reported daily and intermittent neck pain because of her surgery in 2000, but denied receiving medical treatment for the pain. (R. 697.) Dr. Tranese noted that Plaintiff had full ranges of motion in her shoulders, elbows, forearms, wrists, fingers, hip, knees, and ankles, and that her muscle strength and sensation were normal. (R. 698.) Dr. Tranese diagnosed Plaintiff with chronic neck pain. (R. 699.) He opined that Plaintiff "had mild restriction with performing repetitive sustained overhead activities using her arms, and mild-to-moderate limitation with heavy lifting." (R. 699.) Dr. Tranese further opined that Plaintiff had

no other physical function deficits.  (R. 699.)

On December 4, 2014, Johanina McCormick, Ph.D, conducted a consultative psychiatric evaluation of Plaintiff.  (R. 734–37.)  Dr. McCormick's diagnosis was "persistent depressive disorder with anxious distress" and "mild neuro cognitive disorder, provisional."  (R. 736.)  Dr. McCormick opined that Plaintiff required assistance managing her funds due to memory and concentration problems.  (R. 736.)  Lastly, Dr. McCormick stated that the "results of the evaluation appear to be consistent with psychiatric problems, and this may significantly interfere with [the Plaintiff's] ability to function on a daily basis."  (R. 736.)

On December 11, 2014, Dr. McCormick completed a medical source statement detailing Plaintiff's psychological impairments.  (R. 745.)  Dr. McCormick made the following findings: Plaintiff had a serious limitation in the ability to make judgments on simple work-related decisions, understand and remember complex instructions, carry out complex instructions, and the ability to make judgments on complex work-related decisions.  (R. 745.)  Plaintiff had "absent or minimal limitations" understanding, remembering, and carrying out simple instructions.  (R. 745.)  Dr. McCormick also opined that Plaintiff had more than a slight limitation interacting appropriately with the public, supervisors, co-workers, and responding appropriately to usual work situations and to changes in a routine work setting.  (R. 745.)

### ii.  Pain Therapy

From December 24, 2014 until July 2, 2015, Plaintiff received treatment at Pain Therapy Medical Care ("Pain Therapy").  (R. 759–63, 885–93.)

During the December 24, 2014 visit, Plaintiff reported neck and lower back pain radiating to her right leg.  (R. 761.)  Plaintiff stated that on average, on a scale of one to ten, her pain level was a ten.  (R. 761.)  Nurse Practitioner Hyun Ah Kim, who assisted with Plaintiff's

treatment under the supervision of Dr. Henry Sardar, diagnosed Plaintiff with cervicalgia, lumbago, lumbar radiculopathy, muscle spasms, myalgia, and chronic pain syndrome. (R. 759.) Plaintiff received a trigger point injection to the right levator scapula muscle of the neck. (R. 759.) X-rays of Plaintiff's lumbar spine taken that day showed mild dextroscoliosis. (R. 764.) Plaintiff was prescribed, among other medications, Tylenol. (R. 759.)

On January 7, 2015, Plaintiff returned to Pain Therapy for a follow-up visit. (R. 756–58.) Plaintiff reported worsened lower back pain. (R. 757.) On average, on a scale of one to ten, her pain level was a seven, and, at its worst, was an eight. (R. 757.) Nurse Kim prescribed Norco and Zanaflex to treat Plaintiff's pain, and discontinued her Tylenol prescription. (R. 756.) Plaintiff also reported that the injection previously administered helped relieve her neck pain. (R. 757.) An examination of Plaintiff's lumbar spine revealed a positive decrease in Plaintiff's range of motion in all planes, with reported pain at the end range. (R. 757.)

Plaintiff returned to Pain Therapy on January 23, 2015 for another follow-up visit. (R. 753–55.) Plaintiff told Nurse Kim her lower back pain continued to get worse, and described her pain level as being on average and at its worst, a level of ten on a scale of one to ten. (R. 754.) Examination results were similar to the results found on January 7, 2015. (R. 753–54.)

On February 23, 2015, Plaintiff returned to Pain Therapy for a follow-up visit and met with Physician Assistant (PA) Taesoo Kim, who treated Plaintiff under Dr. Sardar's supervision. (R. 749–51.) During this visit, Plaintiff reported sharp and throbbing neck pain. (R. 750.) On average, on a scale of one to ten, Plaintiff's level of pain was a seven and at its worst, was an eight. (R. 750.) PA Kim reviewed a diagnostic imaging report of Plaintiff's cervical spine. (R. 750.) Plaintiff requested and received a trigger point injection to the left levator scapula muscle, which Plaintiff reported helped relieve her pain. (R. 749–50.)

On March 12, 2015, medical personnel at what appears to be Dr. Sardar's private practice completed a Medical Source Statement of Plaintiff's impairments, which was signed by Dr. Sardar. (R. 771.) Dr. Sardar opined the following: Plaintiff could sit for forty-five minutes at one time, and stand for fifteen minutes at one time; in an eight-hour workday, Plaintiff could stand/walk for a total of less than two hours and sit for four hours; Plaintiff could rarely lift less than ten pounds; Plaintiff could occasionally grasp, turn, or twist objects with her hands, perform fine manipulations, and reach; Plaintiff would be off task more than twenty percent of the time during an eight-hour workday; and Plaintiff would have to miss about three days of work per month. (R. 771–75.)

On April 29, 2015 Plaintiff returned to Pain Therapy. (R. 891–93.) Plaintiff was seen by Family Nurse Practitioner Franklina Bekoe, but it is otherwise unclear whether Dr. Sardar, or another physician, supervised Plaintiff's treatment.[1] During the visit, Plaintiff continued to report pain in her neck and shoulder. (R. 892.) A cervical spine examination revealed, among other things, a positive decrease in her range of motion, positive muscle spasm, and tenderness on the cervical paraspinal region. (R. 892.)

On June 5, 2015, Bekoe treated Plaintiff at Pain Management. (R. 894–96.) Plaintiff described to Bekoe that her neck pain was "chronic" and "intermittent," radiating to her upper arm. (R. 894.) Plaintiff noted that her pain was, on average, a six, and at its worst, a seven. (R. 894.) Plaintiff told Bekoe that the pain also interferes with her ability to look up and turn her head to the side. (R. 894.) Another cervical spine examination was positive for decreased range

---

[1] While Dr. Sardar, as supervising physician, co-signed Plaintiff's treatment notes from her visits on December 24, 2014, January 7, 2015, January 23, 2015, and February 23, 2015, he did not do so for her subsequent visits, and it is unclear whether he, or another doctor, supervised Plaintiff's treatment during these visits.

of motion and palpation soreness. (R. 895.) The treatment note reflects that the "level of severity findings" was "moderate." (R. 895.)

On July 2, 2015, Plaintiff went to Pain Management for a follow-up visit. (R. 891–93.) During the visit, Plaintiff made complaints about her neck similar to those made during her June 5, 2015 visit. (R. 891.) Plaintiff requested additional injections to tolerate the pain. (R. 891.) When Bekoe explained the risks of the injections to Plaintiff, Bekoe noted that Plaintiff "understood but continued to explain the suffering that is being experience[d] and that the injections do offer a much needed relief." (R. 885.) Bekoe concluded that "in [her] opinion, the additional injections are appropriate [because] [o]ther conservative therapy has not provided full relief, is contraindicated, or not appropriate." (R. 885.) Plaintiff's "level of severity findings" from her cervical spine examination are noted as "severe." (R. 886.)

### c. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the Act. First, the ALJ found that Plaintiff has not engaged in substantial gainful activity since January 6, 2010, the alleged onset date of her disability. (R. 235.) Second, the ALJ found that Plaintiff had the following severe impairments: status post op right parotidectomy, degenerative changes and disc bulges in the cervical spine, depressive disorder, and anxiety disorder. (R. 235.) Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed under the applicable regulations. (R. 236.) Fourth, the ALJ found that Plaintiff had the RFC to perform light work with the limitation that jobs must be low stress, "defined as jobs containing no more than simple, routine, and repetitive tasks; involving only simple, work related decisions; with few, if any, work place changes; and where there is only

occasional interaction with supervisor, coworkers, and/or the general public." (R. 238.) In making this finding, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. (R. 238.) The ALJ also considered Plaintiff's physical impairments, but found that the record establishes that Plaintiff could still perform the exertional demands of light work. (R. 239.)

The ALJ stated that the RFC assessment was supported by the following evidence: Dr. Moussa's opinion that Plaintiff has only a mild limitation in neck motion; Dr. Tranese's opinion that Plaintiff has a mild-moderate limitation with heavy lifting, only a mild limitation with overhead activities, and no other physical limitations; Dr. Flach's opinion that Plaintiff can perform simple tasks and maintain a regular schedule, can perform some complex and new tasks when motivated, and has no more than mild to moderate limitations relating with others and dealing with stress; Dr. McCormick's opinions regarding Plaintiff's mental abilities; and "a totality of the rest of the evidence." (R. 243.) The ALJ gave "significant weight" to the opinions of Dr. Moussa, Dr. Tranese, Dr. Flach, and Dr. McCormick. (R. 239–42.) However, the ALJ gave "little weight" to Dr. Sardar's medical opinion. (R. 240.)

Finally, the ALJ found that Plaintiff was not capable of performing her past relevant work. (R. 243.) However, the ALJ concluded that, given Plaintiff's age, education, work experience, and RFC, Plaintiff could work as a photocopy machine operator, routing clerk, or marker. (R. 245.) Thus, the ALJ concluded that Plaintiff was not disabled from January 6, 2010 through the date of the ALJ's decision, February 4, 2016. (*Id.*)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine

whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see also Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

Supplemental security income and disability insurance benefits are available to individuals who are "disabled" within the meaning of the SSA.[2]  To be considered disabled under the SSA, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner has promulgated a five-step analysis for evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed.  If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work.  If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations.  When the claimant has such an impairment, the [Commissioner] will find the claimant disabled.  However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work.  Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.  If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the

---

[2]  Supplemental security income is available to individuals who are either sixty-five years of age or older, blind or disabled and who meet certain income requirements.  42 U.S.C. §§ 1382(a), 1382c(a)(1)(A); 20 C.F.R. § 416.202.  Disability insurance benefits are available to individuals who became disabled while meeting the insurance status requirements of the SSA. 42 U.S.C. §§ 423(a)(1)(A), 423(c).  The only issue before the Court is whether Plaintiff is disabled.

> [Commissioner] to prove in the fifth step that the claimant is capable
> of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46

(2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential

evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520"); *McIntyre*,

758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine

whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c. Analysis

The Court understands Plaintiff to argue, among other things, that the ALJ did not

comply with the treating physician rule because he assigned "little weight" to Dr. Sardar's

opinion without providing the requisite "good reasons" for doing so. (Pl. Mem. 5–10.) The

Commissioner argues that Dr. Sardar's opinion was inconsistent with his own medical findings

and with other evidence of record. (Comm'r Mem. 30.) For the reasons discussed below, the

Court agrees that the ALJ's reasons for giving little weight to Dr. Sardar's opinion were

inadequate as a matter of law, and remand is therefore warranted.

"[A] treating physician's statement that the claimant is disabled cannot itself be

determinative."[3] *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*,

177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)

---

[3] The regulations define "treating source" as the claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1502). A "nontreating source" is defined as a "physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902. The parties do not dispute that Dr. Sardar is Plaintiff's treating source. (*Compare* Pl. Mem. 5 (describing Dr. Sardar as Plaintiff's "treating physician") *with* Comm'r Mem. 29 (describing Dr. Sardar as a "treating source").)

(same). But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

If an ALJ declines to give a treating physician's opinion controlling weight, the ALJ must consider a number of factors to determine how much weight to assign to the treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)) (discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good

reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion . . . .").

### i. The ALJ erred by failing to properly apply the treating physician rule

The ALJ, in summarizing Dr. Sardar's opinion, found that it "essentially concludes that . . . [Plaintiff] was only capable of performing less than sedentary work." (R. 240.) The ALJ concluded that this opinion was not entitled to more than "little weight" because (1) Dr. Sardar "was only treating [Plaintiff] for three weeks before rendering his opinion," and therefore "did not possess a longitudinal understanding" of Plaintiff's impairments, and (2) because the opinion "contained unexplained and unsupported inconsistencies." (R. 240–41.) With regard to these "unexplained and unsupported inconsistencies," the ALJ stated that Dr. Sardar "[did] not explain why [Plaintiff] can never have more than rare use of any movement in her head, yet retains the ability to reach occasionally above her head." (R. 240.) In addition, the ALJ found Dr. Sardar's opinion inconsistent with his treatment notes. (R. 241.) As an example, the ALJ noted Dr. Sardar's medical source statement that Plaintiff can "only rarely lift less than [ten] pounds and can never lift more than [ten] pounds," but found that the "only mention of [Plaintiff] having any lifting limitations in the treatment notes states [that Plaintiff] has issues with 'excessive' lifting . . . ." (R. 241.) The ALJ noted that "it is unclear if 'excessive' refers to the amount of repetitions in lifting, the weight of the object to be lifted, or something entirely different." (R. 241.) Neither of the ALJ's reasons are sufficient.

The ALJ's first reason for discounting Dr. Sardar's medical opinion is factually incorrect. Dr. Sardar's medical source statement mistakenly states that he treated Plaintiff for

approximately three to four weeks, despite the fact that, at the time, he had been treating Plaintiff for nearly three *months*. (R. 771.) The ALJ appears to have relied on this statement, even though the ALJ had before him — and in fact cited to — medical records from Dr. Sardar dating back the full three months. (*See* R. 235.) The ALJ's first reason for discarding Dr. Sardar's medial opinion, based on a misinterpretation of the record, is therefore not a good reason to justify his departure from the treating physician rule.[4]

The ALJ's second reason for declining to credit Dr. Sardar's assessments, purported "unexplained and unsupported inconsistencies" fares no better. The ALJ first pointed to Dr. Sardar's failure to explain "why [Plaintiff] can never have more than rare use of any movement in her head, yet retains the ability to reach occasionally above her head." (R. 240.) However, it is unclear what the ALJ found inconsistent about these findings, as no inconsistency between the conclusions is apparent. Without further explanation from the ALJ, the Court cannot conclude that this observation supports the ALJ's decision to dispense with Dr. Sardar's opinion.

Next, the ALJ was similarly perplexed by Dr. Sardar's opinion that Plaintiff can only rarely lift less than ten pounds and never more than that amount, in light of the fact that Dr.

---

[4] The ALJ's factual error is notable in view of a lack of discussion concerning other factors in weighing Dr. Sardar's opinion. The ALJ failed to discuss the frequency of visits, evidence in support of Dr. Sardar's opinions, the nature of the treating relationship, or Dr. Sardar's medical specialization. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)) (discussing the factors). For example, the ALJ did not discuss evidence supporting Dr. Sardar's medical opinion, including the Diagnotic Imaging Report of Plaintiff's cervical spine or the injections administered to Plaintiff because of the severity of her neck pain. (R. 895.) In addition, the ALJ failed to discuss whether Dr. Sardar is a pain specialist and, if so, how that factored into the decision. *See Briska v. Berryhill*, No. 16-CV-5601, 2018 WL 2172674, at *15 (E.D.N.Y. May 10, 2018) (remanding where the ALJ failed to consider "the frequency of [the treating physician's] examinations; the length, nature, and extent of the treatment relationship; the evidence in support of [the treating physician's] opinions; or [the treating physician's] medical specialization").

Sardar's treatment notes contain only one reference to "excessive lifting," but the ALJ was unsure whether this "refers to the amount of repetitions in lifting, the weight of the object to be lifted, or something entirely different." (R. 241.) However, because the "ALJ perceive[d] inconsistencies in [the] treating physician's reports, the ALJ . . . [had] an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." *Messina v. Comm'r or Social Sec.*, --- F. App'x ---, ---, 2018 WL 4211602, at *4 (2d Cir. Sept. 5, 2018).

To the extent the ALJ found Dr. Sardar's treatment notes to be inadequate to support his medical opinion, remand is appropriate to allow Dr. Sardar to provide such support. "Even if the treating physician's 'clinical findings [are] inadequate, it [is] the ALJ's duty to seek additional information from [the treating physician] *sua sponte.*'" *Id.* at *4 (alterations in original) (citation omitted); *see also Orr v. Comm'r of Soc. Sec.*, No. 13-CV-3967, 2014 WL 4291829, at *7 (S.D.N.Y. Aug. 26, 2014) ("The Second Circuit case law . . . makes plain that an ALJ is not free to conclude that a treating physician's report lacks sufficient evidentiary support without first asking the physician to provide such support." (first citing *Rosa*, 168 F.3d at 80; and then citing *Schall v. Apfel,* 134 F.3d 496, 505 (2d Cir. 1998))). After clarification or further evidentiary support from Dr. Sardar, the ALJ may find that Dr. Sardar's treatment notes are not inconsistent with his medical opinion or that his medical opinion is supported by the evidence. Such a finding would impact the weight assessed to Dr. Sardar's medical opinion, which would likely have an effect on Plaintiff's RFC.[5]

---

[5] Remand is also appropriate in light of the ALJ's failure to include any discussion on Dr. Sardar's opinion that Plaintiff would have to miss at least three days from work per month in formulating Plaintiff's RFC. The Second Circuit has held that a medical opinion stating that a social security claimant likely may miss work multiple times per month is probative of the

### ii. The Court cannot further assess whether the ALJ's decision is supported by substantial evidence

As the Court has previously noted, where "an ALJ fails to adequately develop the record in reaching a conclusion as to a claimant's residual functional capacity, the Court is unable to review whether the ALJ's denial of benefits was based on substantial evidence." *Rivera v. Comm'r of Soc. Sec.*, No. 15-CV-0837, 2016 WL 614688, at *15 (E.D.N.Y. Feb. 16, 2016) (first citing *Mantovani v. Astrue*, No. 09-CV-3957, 2011 WL 1304148, at *4 (E.D.N.Y. Mar 31, 2011); and then citing *Butts*, 388 F.3d at 386; and then citing *Mantovani*, 2011 WL 1304148, at

---

claimant's RFC and determining whether the claimant is disabled under the Social Security Regulations. *See Greek v. Colvin*, 802 F.3d 370, 376 (2d. Cir. 2015) (holding that because the plaintiff "could perform no jobs available in large numbers in the national economy if he had to miss four or more days of work per month, the ALJ's failure to provide adequate reasons for rejecting [that] opinion was not harmless"); *Lesterhuis v. Colvin*, 805 F.3d 83, 88 (2d Cir. 2015) (remanding a case to an ALJ because "nothing in the record contradicts [the treating physician's] conclusion about the number of days each month that [the plaintiff] is likely to be absent from work"); *Rugless v. Comm'r of Soc. Sec.*, 548 F. App'x 698, 700 (2d Cir. 2013) (remanding for the ALJ to consider an opinion by one of the plaintiff's treating physicians, which opinion stated that the plaintiff likely would miss more than four days per month).

The ALJ's omission of Plaintiff's likely absences from work is problematic for two reasons, (1) the lack of a contradictory medical opinion and (2) the vocational expert's testimony that there would be no jobs for a person with Plaintiff's determined RFC who had to miss work three days per month. The only possible contradictory opinions regarding Plaintiff's likely absences are Dr. Flach's opinion that Plaintiff can "maintain a regular schedule" and Dr. McCormick's opinion that Plaintiff "can maintain a regular schedule and learn new tasks with help." (R. 743.) However, even if the ALJ considered the opinions of Dr. Flach and Dr. McCormick as contradictory to Dr. Sardar's opinion regarding Plaintiff's likely absences in his decision, remand is nevertheless appropriate because the ALJ failed to include any such reasoning or explanation for rejecting Dr. Sardar's opinion. *See Rugless*, 548 F. App'x at 700 (holding that remand was required because "we need some explanation of why there was no discussion in the ALJ's decision of [the] opinion that [plaintiff] would have to miss more than four days per month"); *see also Lesterhuis*, 805 F.3d at 88 (remanding a case to an ALJ because "nothing in the record contradicts [the treating physician's] conclusion about the number of days each month that [the plaintiff] is likely to be absent from work"). Second, at the hearing, the VE testified that no jobs would be available for a person who would have to miss work at least three days per month. (R. 293–94.) The VE's response highlights the ALJ's error in failing to include Plaintiff's likely absences from work in the RFC determination. *See Greek*, 802 F.3d at 376 (holding that because the plaintiff "could perform no jobs available in large numbers in the national economy if he had to miss four or more days of work per month, the ALJ's failure to provide adequate reasons for rejecting [that] opinion was not harmless").

*4)); *see also Corona*, 2017 WL 1133341, at *18 (declining "to review whether the ALJ's denial of benefits was based on substantial evidence in the record because the ALJ failed to develop the record in reaching a conclusion as to Plaintiff's RFC" (first citing *Ayer v. Astrue*, No. 11-CV-83, 2012 WL 381784, at *7 (D. Vt. Feb. 6, 2012); and then citing *Mantovani*, 2011 WL 1304148, at *4)).  The Court therefore declines to address the parties' remaining arguments without the benefit of an adequately developed record.

### III. Conclusion

For the foregoing reasons, the Court grants Plaintiff's cross-motion for judgment on the pleadings and denies the Commissioner's motion for judgment on the pleadings.  The Court vacates the Commissioner's decision and remands this action for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 28, 2018
       Brooklyn, New York